Ida Caroline Pittis, respondent,

*v.*

Albert Pittis, appellant.

[Decided January 29th, 1914.]

1. In a suit for divorce from bed and board brought by the wife against her husband upon the ground of his extreme cruelty toward her, where it appeared from the evidence that upon the occasion of such alleged cruelty she had provoked him to sudden anger by accusing him of a crime of a peculiarly revolting nature of which he was innocent, a decree for permanent separation should be denied.

2. The principal object sought to be obtained by the court's decree of separation in suits of the present character is the reasonable protection of the wife against future probable acts of cruelty, and where the evidence shows that the previous acts of alleged cruelty of the husband were provoked solely by the wife's voluntary and malicious accusations against him, the necessity for such a decree does not exist.

On appeal from a decree of the court of chancery advised by Mr. J. Franklin Fort, as advisory master.

*Messrs. Nelson & William N. Runyon* and *Mr. Charles A. Reed,* for the appellant.

*Mr. Charles L. Borgmeyer,* for the appellee.

The opinion of the court was delivered by

VREDENBURGH, J.

The defendant has appealed from a decree of the court of chancery adjudging him guilty of extreme cruelty toward his wife so as to render it unsafe and improper for her to cohabit with him, and that they be separated from bed and board forever.

Although the evidence produced before the advisory master covers a period of eight and a half years of the married life of the parties and is of great volume, yet I think but a comparatively brief statement of that evidence will suffice to present the point in which we differ from the conclusion reached by the learned master.

The defendant is about forty years of age and has been for many years a physician in the active practice of his profession in the city of Plainfield, New Jersey. He is the owner of two dwelling-houses there, in one or the other of which he and the petitioner have constantly lived ever since their marriage in May, 1904. They never have had children.

The doctor's parents died before his marriage, leaving valuable real and personal property in New York City, which came under his active management, and he seems, by the evidence, to have collected the rents and profits of the property, and to have divided it among his brothers and sisters equally, he retaining his own share. He became the guardian of the property of his infant sister, who was about thirteen years old at the time of his marriage.

Whether or not this trust situation of the defendant toward his family induced him to feel an obligation to furnish a home for his minor sister, and his two younger brothers, we can only

imperfectly conjecture, because his reason for so doing was not fully inquired into at the hearing before the master, except that defendant stated he had not sufficient means to run the house without them. At all events, after his marriage, he received into his home, as members of his household (without objection, so far as appears, from his wife), his aunt, two of his unmarried brothers and his said infant ward.

His conduct in this regard has been severely commented upon by the learned master in his conclusions, he there saying, *inter alia,* that this act of the defendant was almost certain to lead to trouble between people who were newly married.

While it may be admitted there is force in this criticism under ordinary conditions, it does not seem necessarily to follow that under *all* circumstances trouble would ensue. It may have been the fact here that the wife in her first attempts at housekeeping had ample reason to welcome the assistance and example of experienced friendly hands to lessen the work and reduce the cares of her housekeeping.

But even if this had been an error in judgment on the defendant's part which he, without injustice to those of his family whose interests he had at stake, could have reasonably avoided, it furnished no excuse, much less justification, for the accusations made by the wife against the defendant, disclosed by the evidence to be referred to.

This court, in the early case of *English* v. *English, 27 N. J. Eq. (12 C. E. Gr.) 579,* declared in a suit by a wife for divorce on the ground of the extreme cruelty of her husband, that the decree of final separation in such cases was made *mainly* as a *protection* against *future probable* acts of cruelty.

In the light of this principle where the court can see from the circumstances under which the violence to the wife has occurred, that it is fairly attributable to the sudden, but natural, anger of the husband under the impulse of his momentary irritation (on occasions when he has been goaded to the act by her accusations against him of a revolting crime of which he was innocent), a decree for permanent separation to secure the wife's future protection, would seem to be unwarranted, for the reason that the husband's conduct in such regard depends upon a prov-

ocation resting entirely within the voluntary control of his wife.

The finding by the master on the subject of the alleged extreme cruelty of the defendant upon which the decree below is rested, is thus expressed in his conclusions, viz.: "That he (defendant) struck his wife at least twice the proof seems clearly to establish. That he used offensive language toward her is also shown by the testimony of Thomas Campbell, Martha Fielder, Edward Lewis Lee and Ida Borsum. That he frequently told her to go home to her people and that he would not live with her is also clear. One of the strikings the defendant admits. This was in the automobile on a trip to Westfield. This was so serious that she complained to Police Judge Collins on arrival at Westfield. He corroborates her and the character of her injuries."

This occurrence in the automobile was followed by the actual separation of these parties, and its importance in the cause is such, that when the facts are correctly understood they go far, I think, toward fixing the real blame (for the acts of the defendant commented upon by the master) upon the petitioner herself. The accusation she then uttered, repeatedly, against the doctor, in the presence of his young brother, was one of the gravest which the tongue of a wife or husband could charge against the other.

While it becomes necessary for the proper understanding of the gravity of these charges that their substance should be here very briefly set forth, the exact words used in the testimony need not be set down.

The three persons who occupied the automobile were the petitioner, the defendant and his brother Bertram. The defendant and his brother Bertram testify that on the way to Westfield the petitioner said to her husband that he had had criminal relations with his sister, his ward. They each testify that she repeated the charge and that the "strikings" by the defendant of the petitioner, referred to in the master's report, followed these charges.

An examination of the petitioner's own testimony on this subject will show, I think, a virtual admission of the making by her of the substance of these accusations against her husband.

While it is true that, in form, she denies making them, yet it is manifest from her admissions that she intended to convey, by her language to the defendant, her meaning to the effect that she believed he had had improper relations with his sister.

A brief extract from her testimony as elicited by questions put to her by her counsel will show this:

"*Q.* Did you accuse him of having any improper relations with his sister?

"*A.* I did not. *I said he only led me to believe things that were not proper for a brother to do.*

"*Q.* You did not mean that he had improper relations?

"*A.* Why, no."

Two other witnesses testified that on two other occasions prior to the commencement of this suit, they heard the petitioner say to the defendant that he had had criminal relations with his sister.

But it is needless to refer to other cumulative evidence on this subject. The clear weight of uncontradicted and unimpeached testimony shows that the petitioner made the accusations in question, and there seems to be no room for a doubt, and no escape from the conviction, that they were maliciously uttered by the petitioner, and were sufficient to lead to and provoke the blows of the defendant which immediately followed.

The decree below should be reversed.

*For affirmance*—None.

*For reversal*—THE CHIEF-JUSTICE, GARRISON, SWAYZE, TRENCHARD, PARKER. KALISCH, VREDENBURGH, CONGDON, WHITE, HEPPENHEIMER—10.